30 U.S. 641 (____)
5 Pet. 641
THE UNITED STATES
vs.
ROBERTSON.
Supreme Court of United States.

*647 The case was argued by Mr Berrien, attorney general, for the United States; and by Mr Martin for the defendant.
Mr Chief Justice MARSHALL delivered the opinion of the Court.
This suit was brought in the court of the United States for the fourth circuit and district of Maryland, on the following bond:
Know all men by these presents, that we, Thomas Robertson, Levin Ballard, Arnold E. Jones, Mathias Dashiell, Charles Jones, Marcey Maddux, William Done, George W. Jackson and John H. Bell, all of Somerset county and state of Maryland, are held and firmly bound unto the United States of America, in the sum of one hundred thousand dollars, current money of the United States, to be paid to the said United States, their certain attorney or attorneys, to the which payment well and truly to be made and done, we hereby bind ourselves, our heirs, executors and administrators, jointly and severally, firmly by these presents, as witness our hands and seals this 15th day of July, in the year 1820.
Whereas, on the first day of August 1817, the Bank of Somerset *648 became indebted to the United States for the sum of sixty-nine thousand and seventy-nine dollars and sixty-two cents, deposited in said bank, by George Brown, collector, and others, for the final payment of which sum, and the better security of the United States, an agreement has this day been entered into between the United States on the one part, and the president and directors of the said Bank of Somerset, on the other part, in the words following, viz.
"The directors agree to pledge to the government of the United States, the entire estate of the corporation as a security for the payment of the original principal of the claim, on or before the expiration of the term of five years, from the date of the compromise, and for the fulfilment of this engagement they will bind themselves individually to the United States, in a sum equal to the amount of the debt; and in order that no misunderstanding may hereafter arise respecting the true intent and meaning of the phrase, "the entire estate of the corporation," and the nature and extent of the individual obligation, it is hereby declared to be distinctly understood by both parties, that the entire estate of the corporation means not only all the real estate of the said Bank of Somerset, but also all the debts of every description which are now due and owing unto the said bank, or to which the said bank may have any legal or equitable right whatever; and it is also understood by both parties that the bond of individuals is not intended as a contract for the absolute payment of the said sum of money from their private estates, but as a guarantee that the said president and directors and their successors will fulfil their agreement to preserve entire the estate of the corporation, until the United States are paid and satisfied the said original principal of their claim, and to give a preference to the United States over any other creditor of the bank. The United States agree, upon receiving the bond of individuals, to assign the direction and management of the suit which has been instituted in the district court of Maryland, against the bank, to the individuals who thus enter into bond; and at the expiration of the said term of five years, upon the payment of the sum of sixty-nine thousand and seventy-nine dollars and sixty-two cents, on or before the day of payment, the United States will give a full and free acquittal to the said corporation for the whole claim."
*649 Now the condition of the foregoing obligation is such, that if the said president and directors and their successors shall on their part well and faithfully perform the said contract, and shall, in preference to any other claim against the said bank, pay into the treasury of the United States the said sum of sixty-nine thousand and seventy-nine dollars and sixty-two cents, on or before the 15th of July 1825, then the foregoing obligation to be void, otherwise to remain in full force and virtue in law.
Signed and sealed by Thomas Robertson, Levin Ballard, Jun., Arnold E. Jones, Mathias Dashiell, Charles Jones, Marcey Maddux, William Done, and George W. Jackson.
John H. Anderson, witness.
The issues joined on several special pleas, filed by the defendant, were withdrawn by consent; and nil debet pleaded, under an agreement that the parties might give any matter in evidence which might have been given under any form of pleadings.
It will be perceived from the condition of the bond, that the Bank of Somerset had become indebted to the United States in a large sum of money, on account of deposits made by a collector, and that a suit had been instituted against the bank in the court of the United States for the district of Maryland. On the 15th of July 1820, an agreement was entered into between the United States and the president and directors of the Bank of Somerset, which is recited in the condition of the bond. The principal object of this agreement was to secure the whole estate and property of the bank of every description for the payment of the principal debt, on or before the expiration of five years from the date of the agreement. For the performance of this engagement, the directors agree to bind themselves individually in a sum equal to the amount of the debt; but this bond of individuals is not to be understood as a contract for the absolute payment of the said sum of money, but as a guarantee that the president and directors, and their successors, will fulfil their agreement to preserve the entire estate of the corporation, until the United States are satisfied with the principal, and to give a preference to the United States over any other creditor of the bank. The United States on *650 their part agree, on receiving this bond, to assign the direction and management of the suit to the obligors.
The construction of this bond has been discussed at the bar, as a preliminary question to the several points made in the cause. The United States contend, that the agreement recited in the condition of the bond, is made by the then president and directors of the Bank of Somerset, in their individual as well as corporate character, and that the defendant is bound individually, not merely to the extent of the obligation created by the bond, but also as far as he would have been bound had he signed the agreement in his private character.
The defendant contends, that the agreement was made by the president and directors for the bank, as its legitimate agents, and is to be treated as an engagement made in their corporate character; and that the bond is an undertaking by the obligors, in pursuance of that agreement, by which they become sureties for the bank, that the president, directors and their successors, will perform their engagements with good faith.
In pursuing this inquiry, the form of the instrument and the nature of the transaction must be considered.
The agreement between the United States and the bank is not spread on the record, otherwise than as it is recited in the condition of the bond. It does not appear to have been signed by the president and directors individually. This could not have been omitted, had they intended to bind themselves individually by that agreement. As an official act, it was sufficient that it be entered on their journals; as an undertaking of individuals, it ought to be signed by them. It is referred to in the recital of the condition in these words: "and whereas, an agreement has this day been entered into between the United States on the one part, and the president and directors of the said Bank of Somerset of the other part, in these words," &c. This language indicates, we think, an agreement by the president and directors, in the corporate character in which they are mentioned, rather than in their individual characters in which they are not mentioned. If the president and directors are bound in their private character, is every member of the board bound, whether he was present and assented to the agreement or not? The incorporating act declares, that the affairs of the bank shall be managed by a president and ten *651 directors. Are they all bound by this agreement? If not, who of them are? The paper itself, as recited, does not inform us. If we look out of the condition of the bond to the journals of the corporation for instruction; we are informed, that at a meeting of the board on the 15th of July 1820, the president and six directors attended. If it be contended that this record fixes the members present, one of them, George Jones, who was a party to the agreement, did not sign the bond. Is he bound? If we are permitted to travel out of the bond, and search the journals of the bank for information on this subject, the same record informs us that this whole business was transacted by the board in their corporate character, as acting for the bank.
The great object of the agreement was to pledge the estate of the bank, to secure, as far as it would secure, the payment of the debt due to the United States. None could give this pledge, but those whose official duty it was to manage that property; and they could only give it in the character in which they were entrusted with its management. They alone, in their political character, and their successors, could redeem this pledge; for only those who retained the management of the affairs of the bank during the five years given for the payment of the debt, could keep the estate together, and apply it exclusively to the use of the United States.
To what purpose should the United States require that the directors should bind themselves individually, if they were already bound individually by the agreement itself? This stipulation, being for the benefit of the United States, must be considered as introduced at their instance; and if we may look at the proceedings of the board on the 15th of July 1820, we are informed that the agent of the board, who carried propositions to the secretary of the treasury, reported, that he had made a compromise on the basis of the second proposition, with this modification made by the treasury. But without going out of the bond, this stipulation must be considered as being made on the part of the United States. For what purpose, we repeat, was it made? If the individual members of the board were bound by the agreement, why require a bond from the same persons as sureties for themselves? They could be sued upon the original agreement as well as upon the bond. *652 Why this complex proceeding? Upon the hypothesis of individual obligation under the agreement, it is inexplicable. Upon the hypothesis that the original agreement was a mere corporate act, the whole transaction is accounted for. The agreement being a corporate act, could not affect the members of the board in their private characters: it was a mere pledge of the faith of the corporation, for the violation of which, the corporate funds would alone be responsible, and would add nothing to the security of the government; because the liability of those funds was already as complete as any corporate act could make it. The obligation of individuals therefore was required, who should be sureties that the corporate body would faithfully observe its contract. This is expressly declared to be the effect of the bond, and the purpose for which it was given. The words are: "and it is also understood by both parties, that the bond of individuals is not intended as a contract for the absolute payment of the said sum of money from their private estates, but as a guarantee that the said president and directors, and their successors [not their heirs and executors] will fulfil their agreement to preserve entire the estate of the corporation," &c.
The words which follow the recital of the condition, serve still farther to show the understanding of the parties. They are, "now the condition of the foregoing obligation is such, that if the said president and directors, and their successors, shall on their part well and faithfully perform the said contract," &c. then the foregoing obligation to be void, &c.; obviously referring to a contract made by the corporate body, and to be performed by the corporate body.
An argument against this construction of the instrument has been founded on the following clause. "The United States agree, upon receiving the bond of individuals, to assign the direction and management of the suit which has been instituted in the district court of Maryland to the individuals who thus enter into bond; and at the expiration of the said term of five years, upon the payment of the sum of sixty-nine thousand and seventy-nine dollars and sixty-two cents, on or before the day of payment, the United states will give a full and free acquittal to the said corporation for the whole claim."
The court does not allow to this clause that influence over *653 the agreement for which the counsel for the United States contends. Being a stipulation to assign the management of the suit, not the judgment which should be obtained, the power might have been conferred on the president and directors and their successors, without releasing the debt. If, as we suppose, it was intended as an inducement to incur personal responsibility by affording security to those who should incur it, the clause rather furnishes an argument in favour of that construction for which the defendant contends.
We are of opinion that the agreement recited in the condition of the bond on which this suit is instituted, is in fact made, and was understood by the parties to be made by the United States, with the Bank of Somerset acting by its lawful agents, the president and directors of that bank; and that the obligors bound themselves, as sureties, that the bank would faithfully perform its engagements.
At the trial of the cause, the following points were made at the bar by the counsel for the United States, and the opinion of the court was asked upon them.
1. That, by the bond on which this suit is brought, the defendant has undertaken that the estate of the bank, including its debts, shall be applied in the first instance to extinguish the debt due to the United States in five years, if that estate was sufficient to extinguish it; and if the jury shall be of the opinion that the estate, at the date of the bond, was sufficient, and might, by the use of proper means on the part of the defendant and his co-obligors, have been rendered available to that purpose, within the time limited by the bond, the defendant is answerable for any portion of the debt ascertained upon the face of the bond, which remained due to the United States at the expiration of the five years given by that bond, and which still remains due.
2. That it being admitted the statement of the condition of the bank, on the 11th May 1820, which has been offered in evidence, proceeded from the obligors in the bond, and has been furnished by them, it is an admission on their part that the estate of the bank was at that time sufficient to have paid the debt due to the United States, and throws the burden of proof on the defendant to show how it afterwards became insufficient; and, in the absence of satisfactory proof on this *654 point, the estate of the bank is to be held sufficient to have paid the debt due to the United States within the five years given by the bond, and the defendant is answerable for any portion of that debt which remains unpaid to the United States.
3. That, among the duties imposed on the defendant by the bond, was that of calling in the debts due to the bank in the most expeditious and effectual manner; and if the jury shall believe that a resort to attachment against the bank debtors in the name of the United States, on the judgment which had been obtained by the United States against the bank, was the most expeditious and effectual manner, and that the obligors in the bond have not resorted to this mode of proceeding, they have been guilty of a breach of their undertaking in the bond, and are answerable for the full value of any debt which might have been secured by that mode of proceeding.
4. That by the bond, on which this suit is brought, the obligors were bound to use diligence in enforcing the collection of the outstanding debts due to the Bank of Somerset at the date of the bond; and that if they have failed to employ the best means which the law placed in their power, to enforce such collection, they are responsible for all losses proceeding from their neglect to use those means, &c.
5. That having been authorized to proceed against the debtors of the bank on the judgment which had been obtained by the United States against the Bank of Somerset, and to enforce the proceedings against those debtors as garnishees, which had already been instituted in that suit, as well as to take out new attachments against other debtors in the name of the United States, the plaintiffs in that judgment; if, instead of resorting to these proceedings, they brought new actions against their debtors in the state courts, and by the adoption of this latter course, debts have been lost which might have been saved by resorting to the process of attachment against those debtors under the judgment before mentioned, the defendants are liable for all such losses.
6. That if the jury shall be satisfied that the statement of the condition of the bank, on the 11th May 1820, was its true condition at that time, and that no proof has been offered by the defendants to show that this condition was variant at the date of the bond, the defendants can repel the inference of the *655 solvency of the bank in no other way, than by showing to the satisfaction of the jury, that the debtors, whose debts compose the aggregate of one hundred and six thousand nine hundred and ninety-five dollars presented on the statement, were wholly or partially insolvent; and that the defendant was unable to collect the debts, either by reason of such insolvency, or by some legal impediment which they could not control; and that, in the absence of such proof, the legal presumption will be that such debtors were solvent, and that those debts might have been collected by the use of due diligence; and if they have not been collected and paid over to the United States, that the defendant is liable for the amount of the debt acknowledged in the bond to be due to the United States, or for whatever balance of that amount remains unpaid to the United States.
7. That attachments at the suit of the United States which had been laid in the hands of the debtors to the Bank of Somerset, prior to the date of the bond, fixed the debts in the hands of such debtors; and that such debts could be discharged only by the payment of good and lawful money, equal in value to the amount of such debts; and that if the obligors in the bond on which this suit is brought, did afterwards receive such debts from the debtors, in depreciated notes of the Bank of Somerset or any other depreciated paper, the defendant is liable to the United States, in good and lawful money for the amount of debts so received in depreciated paper, if there be no proof that such debtors were in circumstances so insolvent, as that they could not have paid their debts in good and lawful money.
8. That by virtue of the agreement recited in the bond, on which this suit is brought, and of the bond itself, the debts due to the bank were so pledged to the United States, that the obligors in the bond had no right to receive these debts in the depreciated notes of the Bank of Somerset; and that if after the date of the bond they did so receive them, they are liable to the United States, in good and lawful money for the amount so received, if there be no proof that the debtors from whom they were so received were in circumstances so insolvent, that they could not have paid these debts in good and lawful money.
9. That by virtue of the bond and the agreement therein *656 recited, the defendant was bound to see that the estate of the bank, as described in the agreement and bond, should be applied in the first instance to the payment of the debt due to the United States, before any payment made to any other creditor; and that if any portion of that estate has been paid to the holders of certificates of deposit, which were outstanding at the date of the bond, or if these certificates have been received in payment of debts due by the holders to the bank, the defendant is liable for all sums so paid to the holders of such certificates, and for the amount of all debts for which such certificates have been received in payment, if there be no proof that the debtors from whom they were so received were in circumstances so insolvent, that they could not have paid those debts in good and lawful money.
10. That in all cases where, after the date of the bond, moneys have been shown to have been paid under executions at the suit of the bank, placed in the hands of Charles Jones, the sheriff of the county, who is admitted to have been one of the obligors in the bond, the defendant is liable for all such amounts so received by the said Charles Jones.
11. That the defendant had no authority to pay away any part of the estate of the bank, as described in the bond, to the purpose of relieving liens on the estates of the debtors to the bank; but their duty was to have collected the debts due to the bank out of the estate of such debtors, which they will be presumed to have been capable of doing until the contrary is proved; and in the absence of such proof, they are liable to all sums paid away for such liens.
12. That as it was in the power of the obligors to have proceeded by attachment against the debtors of the bank, under the judgment which had been obtained in the district court of the United States, the institution of new suits against such debtors in the county court of Somerset was unnecessary, until it shall be proved that they could not have so proceeded; and that the costs and expenses attending these suits were incurred by the obligors, in their own wrong, and must fall upon them; and the defendant is entitled to no credit on account of such costs and expenses, but must answer for the value of these debts clear of any other costs and expenses, than would have arisen from his proceeding by attachment in the courts of the United States.
*657 13. That the defendant was not authorized to diminish the amount of the estate of the bank, by the payment of a commission for collection to William Done, one of the obligors.
14. That if the resolution of the board of directors, of date the 16th June 1818, authorizing the stockholders to assign their stock at ninety dollars, in discharge of their debts, was made for the purpose of shielding the stockholders from the judgment of the United States and the process of attachment against the debtors of the bank which the United States were authorized to sue out against these debtors, such transfers of stock were fraudulent and void; and it was the duty of the obligors to have re-asserted these debts, as they stood prior to such transfer of stock, and to have proceeded to recover them by the legal process of attachment in the name of the United States; and that if they failed to do so, such failure was a breach of their duty under the said bond and contract; and if such debts might have been so recovered by the use of due diligence, the defendant is liable for the amount.
15. That if process of attachment, at the suit of the United States, had been served on these stockholders, prior to such transfer in payment of their debts, such debts became fixed thereby to the United States; and the subsequent transfer of stock in extinguishment of them was a void act, and these debts constituted a part of the estate of the bank, which the defendant was bound to apply to the payment of the debt of the United States, and not having done so he is liable for those amounts.
And the counsel for the defendants made the following points:
1. That by the true construction of the bond, the obligors undertook for the acts of the corporation only, and not for their own conduct as individuals, or the conduct of any other individuals, not being the agents of the corporation.
2. That payment made to the sheriff is no payment made to the bank, and that the defendant is not liable for any money received by the aforesaid Charles Jones as sheriff, unless the same was paid over to the bank, or to the agents of the bank lawfully authorized to receive the same.
3. That the bank is not liable for any depreciation in the *658 money, which the bank was compelled to receive by the judgment of the Maryland courts.
4. That the corporation had not the right to use the attachments which had issued from the district or circuit court; nor to order any process connected with the suit or judgment of the United States against the Bank of Somerset, and cannot therefore have been guilty of negligence or misconduct, by reason of not attempting to use the said attachments or to issue process on said judgment.
5. That the defendant is not liable for any depreciation in the money, which the bank was compelled to receive by the judgment of the Maryland courts, unless the jury find that the bank was guilty of culpable negligence or misconduct, in prosecuting their claims in the courts of Maryland, instead of using the attachments issued from the district or circuit court of the United States.
6. That if the jury believe that the property, from which the liens were removed, by payments of the Bank of Somerset, as stated in the evidence, has come to the hands and possession of the plaintiffs, and is worth more than such liens, and that the payment of such liens was made with an honest intention and view, for the benefit of the United States, then the plaintiffs are not entitled to recover the amount so paid for such liens, as stated in the evidence.
7. That if the jury find from the evidence, that the taxes, officers' fees, counsel fees and commissions, paid by the bank, were actually due, and that the said taxes were lawfully chargeable on the said property, when in the hands of the bank, as the agent of the United States, and that the said officers' fees and counsel fees and commissions became due on account of suits instituted by the bank, as the agent of the United States, under the contract upon which this suit is brought, and that the said fees and commissions were lawful and reasonable; that then the plaintiffs are not entitled to recover the amount so paid by the bank, of taxes, officers' fees, counsel fees and commissions, unless the jury find that, in instituting the said suits, the said bank from negligence and misconduct violated its duty to the United States.
Upon these points too the instructions of the court to the jury were requested.
*659 The record states that the judges being opposed in opinion on each of these questions, ordered them on motion of the counsel for the plaintiffs to be certified to this court for its decision; and discharged the jury.
Some general propositions have been stated in argument which bear upon all the points; and which will be considered before we proceed to apply them to the several specific questions which have been certified by the circuit court.
The counsel for the United States insists, that by the act of 1818, the United States were empowered to enforce payment of the judgment they might obtain against the bank, in specie, by summoning the debtors of the corporation as garnishees and obtaining judgments against them. The act provides, that in any suit thereafter instituted by the United States against any corporate body for the recovery of money upon any bill, note or other security, it shall be lawful to summon as garnishees the debtors of such corporation, who are required to state on oath the amount in which they stand indebted, at the time of serving the summons, for which amount judgment shall be entered in favour of the United States in the same manner as if it had been due and owing to the United States.
This act operates a transfer from the bank to the United States of those debts which might be due from the persons who should be summoned as garnishees. They become by the service of the summons the debtors of the United States, and cease to be the debtors of the bank. But they owe to the United States precisely what they owed to the bank, and no more. On the 9th of February 1819, the legislature of Maryland, passed an act, declaring that in payment of any debt due to, or judgment obtained by any bank within that state, the note of such bank should be received. This act, so far as respects debts on which judgments have not been obtained, embodies the general and just principles respecting offsets which are of common application. Every debtor may pay his creditor with the notes of that creditor. They are an equitable and legal tender. So far as these notes were in possession of the debtor at the time he was summoned as a garnishee, they form a counter claim, which diminishes the debt due to the bank to the extent of that counter claim. But the residue becomes a *660 debt to the United States, for which judgment is to be rendered. May this judgment be discharged by the paper of the bank?
On this question the court are divided. Three judges are of opinion that by the nature of the contract and by the operation of the act of Maryland upon it, an original right existed to discharge the debt in the notes of the bank; which original right remains in full force against the United States, who come in as assignees in law, not in fact; and who must therefore stand in the place of the bank.
Three other judges are of opinion, that the right to pay the debt in the notes of the bank does not enter into the contract. A note given to pay money generally, is a note to pay in legal currency, and the right to discharge it with a particular paper, is an extrinsic circumstance depending on its being due to the person or body corporate responsible for that paper, which right is terminated by a transfer of the debt.
The counsel for the United States also contend, that the obligors are responsible in this suit for the act of any individual who has signed the bond, by which any portion of the estate of the bank may have been lost: and for the omission of the obligors to perform any act within their power, which might have enabled the corporate body to collect its debts, in money of more value than its own notes.
We do not think so. Whatever obligations a sense of right might have imposed upon them as members of the corporation, the obligation imposed by the bond itself is measured by its terms. They do not undertake for their general conduct as individuals. They do not undertake for each other as to any matter not expressed in the bond. They undertake that the bank shall perform the contract recited in the condition and for nothing more.
The bond does not stipulate that the obligors will do any thing which may facilitate the operations of the bank in collecting its debts and performing its contract with the United States.
It has been urged that they might have used the power to direct and manage the suit, so as to compel the debtors to the bank, by summoning them as garnishees, to discharge their debts in specie. The United States have not required them to make *661 any use of the power to manage and direct the suit. Nothing is specified, nor is any thing either demanded or undertaken on this subject. Were this court to insert it, we should add a new term to the bond, and create an obligation which the parties have not imposed upon themselves. We should do something more than construe and enforce the contract.
In the state in which the record now appears, this question does not regularly arise. If the obligors were bound to use their power to direct and manage the suit, in the manner most advantageous to the United States; if we could suppose that the power was given, not for the benefit of the obligors who obtained it, but for the benefit of the United States, who agreed to surrender it unconditionally, for something else stipulated in the bond: still this obligation, so to use the power, could not commence until the power was given. This we think is not shown by the record.
The bond was executed to the United States, and this action is a proof that it was accepted. So far as respects the liability of the obligors, as sureties for the bank, the acceptance has relation to the date: but so far as respects the liability to be created by a subsequent act of the obligee, this relation cannot be sustained. The actual time of acceptance becomes a subject of inquiry.
The record furnishes reason for the opinion, that the bond was not accepted at its date, on the 15th of July 1830. The acceptance being a fact in pais, we may look out of the bond for proof of it.
The directors agree to bind themselves individually for the performance of the contract recited in the condition. This was required by the treasury department, in terms implying that all the directors should so bind themselves. The act incorporating the Bank of Somerset makes the board to consist of a president and ten directors; the bond is executed by the president and seven directors. It remained some time for the signature of others, and was incomplete at its date. It might, without the slightest breach of faith, have been rejected by the secretary of the treasury; and, as it did not conform to his original proposition, remained as an escrow until approved by him. The record furnishes some evidence that it was not immediately approved.
On the 26th of June 1821, the board of directors ordered, *662 "that William Done proceed as soon as convenient to the seat of government, for the purpose of finally settling the arrangement entered into with the treasury department; and he is also requested to ascertain the state of the suit or suits brought by the United States against the bank and its garnishees, in the district court of Maryland."
If then the power claimed for the obligees, to direct and manage the suit of the United States, was conferred by the mere operation of the bond; it could not be conferred until the bond was actually accepted, and the time of acceptance ought, for this particular purpose, to be shown. But this power is not conferred by the mere operation of the bond. It requires a distinct and independent act on the part of the government. "The United States agree, upon receiving the bond of individuals, to assign the direction and management of the suit which has been instituted in the district court of Maryland against the bank, to the individuals who thus enter into bond." Till this authority was actually given, the attorney for the United States would have disregarded, and ought to have disregarded any orders received from the obligors in the bond.
Suits were instituted by the bank against its debtors in the courts of the state; by whose judgment the bank was compelled to receive not only its own notes, but the certificates of deposit held by its debtors. The counsel for the United States insists that the bank is responsible for the sums so received, in violation of its agreement to give a preference to the United States over other creditors. So far as this act was voluntary on the part of the bank, it is a violation of the contract, for which its sureties are liable. But how far was it voluntary? The bank possessed no other means of collecting its debts than through the medium of the state courts. It might therefore be necessary to resort to those courts in order to avoid a total loss. The act of limitations, independent of those casual insolvencies which might occur, would have formed a serious deduction from that estate; which it was their duty to preserve entire for the United States. The bank, perhaps, might have made, and sound morality required that they should have endeavoured to make new arrangements with the United States. It is not certain that any arrangements which would remove difficulties *663 with which the whole transaction was embarrassed, were practicable. But, be this as it may, we perceive no other course which was prescribed by duty and by contract, with respect to their debts generally, than to sue in the state courts. With respect to those debts which were attached by the United States, the same division of opinion exists as with respect to their payment in the notes of the bank.
We will now apply these principles to the particular points on which the judges of the circuit court were divided.
On the first question propounded by the counsel for the United States, and also on the first question propounded by the counsel for the defendant, this court is of opinion, that the obligors undertook for the faithful performance by the president and directors, of the contract recited in the condition of the bond, on which the suit is instituted; and not for their own conduct as individuals; and that they are responsible for any failure on the part of the bank to perform that engagement.
On the second and sixth questions propounded by the plaintiffs, this court is of opinion, that the statement of the condition of the bank of the 11th of May 1820, which appears in the record, is evidence to be submitted to the jury, who are to judge on the whole testimony how far the estate of the bank was at that time sufficient to pay the debt due to the United States; and if any part of that estate has been wasted or misapplied by the corporate body or their agents, or has been appropriated unnecessarily to any purpose other than towards the debt of the United States, or is otherwise unaccounted for; the defendant is responsible for such misapplication or waste. and for any sum not accounted for.
On the third and fourth questions propounded by the plaintiffs, this court is of opinion, that the obligors did not undertake by their bond to call in the debts due to the bank. That duty was to be performed by the president and directors of the bank; for whose faithful performance of it the obligors are responsible.
The court does not perceive the application of the fifth question on the part of the plaintiffs to the cause, unless the president and directors of the bank be considered as the obligors, which idea is negatived in the answer to the first question. *664 The obligors had no power to bring actions against the debtors of the bank in the state courts.
On the seventh question propounded by the plaintiffs, this court is of opinion that the attachments at the suit of the United States which had been laid in the hands of the debtors to the Bank of Somerset, prior to the date of the bond, fixed the debts in the hands of such debtors, as to the sum remaining due after deducting the legal offsets against the bank then in the hands of such debtors. This court gives no opinion as to the money or paper in which the sum so remaining due was demandable.
The eighth instruction required by the plaintiffs ought not to be given as asked.
The ninth question is answered in the opinions given by this court on the preceding inquiries.
On the tenth question propounded by the plaintiffs, and the second propounded by the defendant, this court is of opinion that the bank is liable for the money received by Charles Jones, as their collector; and the defendant is liable therefor as their surety; but that the bank is not liable for the money which came to his hands as sheriff, unless the president and directors were guilty of negligence in using the appropriate means to draw it out of his hands in reasonable time.
On the eleventh question propounded by the plaintiffs, and the sixth propounded by the defendant, this court is of opinion that it was the duty of the president and directors to collect the debts due to the bank. In the performance of this duty it might be necessary to purchase property pledged to the bank which was subject to prior liens, and to relieve such property from its prior incumbrances, in order to avoid a total loss of the debt. This may have been advantageous, or may have been disadvantageous to the United States.
We think the transaction, with all its circumstances, ought to be submitted to the jury; and that the liability of the defendant can in no event exceed the actual loss sustained by the United States, in consequence of the bank having taken the property, by discharging the prior incumbrances instead of suing the debtor in the state court.
On the twelfth question propounded by the plaintiffs, and *665 the seventh, propounded by the defendant; this court is of opinion, that the president and directors of the Bank of Somerset, had no power over the judgment of the United States. They could therefore proceed only in the state courts; and were entitled to credit for such necessary expenses, as were incurred in such suits as it was prudent to bring.
On the thirteenth question, propounded by the plaintiffs; this court is of opinion; that the propriety of allowing the commissions paid to William Done depends on their reasonableness.
On the fourteenth and fifteenth questions, propounded by the counsel for the plaintiffs; this court is of opinion, that the instructions ought to have been given as asked; except so much of the fourteenth, as states it to have been the duty of the obligors, instead of the president and directors, to reassert these debts; and so much as supposes a power to proceed by the legal process of attachment in the name of the United States; and except so much of the fifteenth as supposes a power in the defendant to apply the funds of the bank.
The court is of opinion, that the third, fourth, and fifth instructions, moved by the counsel for the defendants, ought to be given as asked; except so much of the fifth as submits to the jury the question on the power of the bank, to use the attachments issued from the district court of the United States.
All which is to be certified to the circuit court, for the fourth circuit and district of Maryland.
Mr Justice BALDWIN dissenting.
I consider the directors of a bank, as its chartered agents; and the bank as bound by their acts, when they are within the powers, and are exercised on the subjects, and in the manner authorized by the charter. 12 Wheat. 52, 53, 58, 83, 87. Shankland vs. Corporation of Washington, decided at this term. If a corporation is authorized to raise money by a lottery, their agents cannot sell it; 12 Wheat. 55; if to raise a specific sum they cannot raise a quarter. Lee vs. Manchester Canal, 11 East. 645, 654. Every act of fraud, departure from their duty, or any other illegal act, committed by the directors of a bank, or the cashier, by their connivance and permission; however, sanctioned *666 by the uniform usage of the board; is an excess of power and void from illegality. 1 Peters, 71, 72. The directors are liable individually; but the bank cannot be bound by their doing that, which they had no lawful power to do, or which was a violation of some duty enjoined by the charter, or resulting from the nature and objects of the incorporation; for the directors are not then their agents. A corporation is strictly limited to the exercise of those powers which are specifically conferred on it. 4 Peters, 168. 2 Dows. P.C. 521, &c. The directors own none of the property or funds of the bank. They are trustees for the stockholders and creditors. Their control over the effects is entirely fiduciary, and responsible; deriving their power over them by the act of incorporation, they must execute it according to its provisions and directions; which are in their nature creative, and not merely restrictive, inherent powers. If the act of incorporation is their only authority, they must act within its precise terms. 2 Dow. P C. 523. By section thirteenth, of the charter, they may manage the funds in the common course of banking, for the use and benefit of the stockholders; but for any fraud are liable to an indictment, a suit by the bank for damages sustained, or forfeiture of their stock.
If they manage them in any other way, they do it on their own individual responsibility, not on that of the bank, as its authorized agents; if misapplied funds of the corporation come to the hands of innocent third persons, they cannot be recovered back. But if the directors make a contract which contains stipulations exceeding their authority; it cannot be enforced against the bank by the party contracting with them. By the act of contracting with the agents and trustees of a corporation, the party is presumed and bound to know the nature, extent, and the legitimate objects of their authority; according to the terms of the charter; and, necessarily, contract subject to them.
The twelfth section of the law of Maryland, ch. 32. December 1813, chartering the bank of Somerset, enacts that, "no member of said company shall be answerable in his personal, or individual property, for any contract or engagement of said bank, or for any losses, deficiencies or failures thereof, of the capital stock thereof: but all the capital stock, together *667 with all its property, rights and credits of the said institution shall at all times be answerable for demands against said bank."
At, or as near the date of the bond as could be ascertained, according to the statement given in evidence by the plaintiffs, the bank owed the creditors one hundred and thirty thousand dollars; whereof there was due to the holders of notes, fifteen thousand dollars to individual depositors, forty-six thousand dollars; and to the United States, sixty-nine thousand dollars. The whole property and effects of the bank, amounted to one hundred and thirteen thousand dollars; of which sixty thousand dollars appear to be lost by insolvencies. The state of the bank, in May 1820, shows on its face a deficit of twenty-one thousand dollars; short of the debts. With this law and statement of the bank before them, the plaintiffs and the directors entered into the agreement of the 15th of July 1820; by which the entire estate of the corporation was pledged to the United States, for the payment of their debt of sixty-nine thousand dollars; and they were to have a preference over every other creditor of the bank. They were entitled to no such preference by law; and unless the agreement of the directors gave it to them, under their authority as agents of the bank, they cannot enforce it. The power and right of an individual to prefer one creditor to another, is undoubted; not because any law confers that right upon him, but being the owner, and having full power of disposing of it as he pleases among his creditors, or to sell it for money, the distribution or payment of it at his pleasure among them, results from his ownership; and no law has prohibited, or restrained him. But, to my mind, an agent or trustee of a banking corporation is in a different situation; he has no rights of individual ownership; his control over the effect is solely derived from the law; regulated and controlled by it, in any application he may make of it. The moment he exceeds his chartered powers, or violates his duty as prescribed by law, all privity between him and the bank ceases: he is no longer their agent; and his acts are no longer theirs. Conceding the rule to be, that in a contest between creditors at the counter of a bank, the note or check first presented, may be first paid, by the cashier; it cannot, in my opinion, apply to real estate, or unavailable effects; which require time and legal process for their collection; and which *668 the charter declares, shall be at all times answerable for demands against the bank. Directors have no inherent right in the property, or control over it; resulting from ownership which gives them the power of individual debtors to give creditors a preference. The charter gives them none. Their authority must then be implied, either from the general scope and objects of the incorporation; or be incident to the agents and trustees of all monied and other corporations, in a case of known and ascertained deficiency to pay its corporate debts. If there is in the statute or common law of Maryland, or any state in this union, such a principle, it is wholly unknown to me. If instead of declaring a pre-existing rule, a new one is adopted from reasons of supposed analogy, justice or inconvenience; I cannot withhold my dissent to its adoption: for I can perceive no reason which permits preferences by individuals, which do not instead of authorizing, forbid the application of the rule to the trustees of the corporation: nor can I perceive the justice of preferring one note holder, or one depositor to another. It would seem to me a justice unknown to the common law, to apply all the effects of an insolvent corporation to the debt of the government, and strip individuals. In such a case, the rule that equality is equity, would seem a very appropriate one. An equal distribution of all the effects among all the creditors, would certainly not operate unjustly. I can apply no other rule to this case, in the absence of any provision in the charter; or present at common law authority to the contrary.
An agreement, like the present, made by an executor or trustee, under a deed or will, by an administrator or guardian, would be an excess or abuse of power. Creditors excluded by the agreement, would have their remedy on the fund. Yet, in all these cases, the trustee has an interest in and control over the property entrusted to him; at least equal to that of the bank directors, in and over the effects of the corporation. If the giving a preference to one, and excluding all other creditors, would not be deemed a fair execution of the powers of the former classes of trustees; it is difficult to assign the reasons which on settled principles of law, would confer on the trustees of a corporation, an extent of authority unknown to any private trustees. A power given by will, deed, or assignment, *669 to a trustee, to sell property to pay the debts of the party executing it, would not be well executed by such an agreement, and bond as this: nor can it be a compliance with the clear direction of the twelfth section of the charter: the express words of it import a different meaning. The whole capital stock, property, rights and credits of the bank are answerable for demands upon it. They are thus pledged alike to all. While the demand is unsatisfied, the pledge is unredeemed, and directly violated; if the whole fund is appropriated to the demand of a favourite. It cannot be pretended, that the appropriation of the whole fund to the United States exonerates the bank from their obligation to pay the sixty thousand dollars due to individuals: their demands are not extinguished thereby, but remain in full force, after all the corporate effects are disposed of. And this becomes the situation of the parties: the private creditors have just and legal demands against the bank, arising from a deposit of their money; the United States have a demand of the same kind: the bank are bound to pay both, if their property and effects are sufficient; but their effective means fall short of either debt. The thirteenth section expressly releases the members of the company, exempts their persons and property from all liability for the contracts and engagements of the bank, or losses, deficiencies and failure of the capital stock: thus making the capital stock the only fund for payment. Two creditors then, having debts contracted in the same way, have by law a pledge of the whole estate and effects for their security. The trustees of the fund apply the whole to one creditor: the other receives nothing. All the losses are thrown on him; he has a right to a judgment against the bank, as his debtor; but can take neither their property nor effects, and the law prohibits him from resorting to any individual member of the company. I cannot consider this as any thing short of a palpable perversion of the corporate powers of the directors; by depriving innocent individuals of every possible remedy for the clearest possible right.
If it is said, that the directors are answerable individually, to the injured creditors: that could only be on the legal result of the acts done by them; for, if they act within their chartered authority, they are mere agents of the bank; and as such expressly exempted from all personal responsibility. It is only *670 by an excess or abuse of their authority, that they cease to be agents, and act at their individual peril; and it follows, necessarily, that in so doing their acts are void as to the bank, and cannot operate as a corporate transfer of corporate property, to one, who is a party to an unauthorized transaction.
If the charter gives power to apply the corporate effects to one creditor only, when it is unable to pay all, the directors have the same power to prefer one stockholder, after the debts are paid; and in either case might prefer themselves. Stockholders, debtors to the bank, might apply their notes to the reimbursement of their capital paid in; throw all the losses on those stockholders who had borrowed no money, and on whose funds the operations of the bank had been carried on. The directors themselves, and the preferred debtors of the corporation, would thus receive back their whole stock, where the creditor stockholders lose all theirs.
When the debts of a bank, due to the holders of their paper, or their customers, are paid; stockholders being creditors, are entitled to payments of their demands. The thirteenth section directs the directors to manage the funds, "for the use and benefit of the stockholders;" and the twelfth pledges them for all demands upon the bank. After the out of doors debts are paid, the claims of stockholders are as sacred as those of depositors were before payment; and any acts of the directors, not strictly authorized by these sections of the charter, are inoperative and void; as well against the bank as against those who are creditors, by holding their notes, or depositors or stockholders.
The charter of any corporation is the only source of its powers, and the only authority by which any can be exercised: it is opposed to all sound rules of construction, to consider that which confers, as merely restraining and controlling powers, incident to the incorporation; and therefore to be construed strictly as a limitation or exception to powers which preexisted, or necessarily resulted from it; as is the power to make by-laws to sue and be sued, &c. &c. The power to manage, control, and dispose of the corporate property, is a special authority given by the charter. None can be exercised which is not explicitly granted: and it can only be exercised on the precise subjects over which it is given, and within the *671 limits definitively assigned. No charter ever gave a right of preference of one creditor of the corporation to the exclusion of all others; none ever authorized a transfer of all its property, as this assignment does: and those who claim a right under it are bound to show, affirmatively, the authority of the directors to do so by the terms of the charter. The injured creditors are not bound to show a negative of the power by any restrictions or prohibitions. It is an universal principle, that he who claims under a special authority must show its existence and lawful exercise: to throw the burthen of proof on the party whose rights will be destroyed by its abuse, would be the utter reversal of every rule which governs the execution of powers. The charter expressly pledges the whole property of the bank to the payment of the demands upon it. The creditor who claims the whole, by the act of the directors, the agents of the bank, and the trustees for all creditors and stockholders; must, especially when plaintiff, clearly make out their power to give him the preference. The absence of a restriction is no evidence of the grant of the power. The general pledge for all demands can only be dispensed with by express power to transfer that pledge to the satisfaction of one, by withdrawing it from all others. This rule clearly results from the case before cited: and is clearly established in those which follow. An act of parliament authorized the directors of an incorporated company, in order to raise money by loan and secure its repayment, to give a mortgage of their tolls: it was held not to empower them to mortgage their toll houses; and they are not estopped by their deed from denying their power. 2 D. and E. 171. Where a mortgage was given pursuant to a similar act of parliament, in order to secure their loans to one creditor of the company, contrary to the provisions of the act prohibiting a preference; it was declared that he was a bailee for all others who loaned their money under the authority of the act, that they should receive their due proportion. Banks vs. Booth, 2 Bos. and Pull. 222. Where tolls were granted to a company, to reimburse them for money subscribed to a canal, they cannot diminish their rate, or make their rate unequal, by giving a preference to one person, using it for transportation, over *672 another (Lees vs. Manchester Canal, 11 East, 656): or reduce tolls at one gate and not at all. King vs. Bury, 4 Barn. and Cress. 361.
The principle of these cases applies to this; the second is much stronger. The thing mortgaged was only the profits; the property from which they were to accrue remained in fee to the company, subject to the payment of the loan. The preference given by a mortgage to one lender, was only as to the time of payment; and did not diminish the security of the lenders. Both cases show the great strictness in which the powers of a corporation must be exercised. The case of canal tolls seems conclusive; so far as any decision of the court of king's bench can be, to show that an agreement to give a customer a preference in a reduced rate of toll is void, as an excess of the corporate powers of the directors. An agreement to transfer the whole property of the corporation to one creditor, or stockholder, would not have been enforced in Westminster Hall.
"No argument drawn from convenience can enlarge the powers of a corporation." 4 Peters, 169. "A general authority in the charter, that the directors shall have power to do whatever shall appear to them necessary and proper to be done, for the well ordering of the interest of the proprietors, not contrary to the laws of the state;" was not intended to give unlimited power: but the exercise of a discretion, within the scope of the authority conferred. 4 Peters, 171. Such words are restricted by the other provisions of the charter. 4 Peters, 171.
Construing the one to the Bank of Somerset, by rules so well settled, I cannot consider the agreement in question to be within the legitimate powers of the directors. In the case of She vs. Bloom, 19 Johns. Rep. 456, 477, the court of errors decided, with only one senator dissenting, that a resolution of the board of directors of a manufacturing company, giving the stockholders the privilege of forfeiting their shares on paying thirty per cent, "was utterly inoperative against the fundamental principles of law and equity; legally fraudulent, and therefore void and inoperative," because a debt due to an only creditor would have been only partially paid, by depriving him of his only means of satisfaction by a resort to the stockholders *673 rateably until his debt was paid. The agreement in this case produced a worse effect, as it cut off a class of creditors to the amount of sixty thousand dollars from the hope of a dividend.
If the directors have this power of preference among the holders of their notes, depositors and stockholders, it must be as incidental, not only to all banking, but other insolvent corporations; if incidental to corporate trustees, it must be applied to those who act under individual authority to hold the trust fund answerable for demands or debts due by the person giving the directions to manage and dispose of it, for his use and benefit. I must dissent from the adoption of these principles; which my judgment tells me forms no part of the common law.
If this was the case of a bank, solvent but embarrassed, requiring only time to wind up their concerns; and the preference given to the United States was only as to time, the question would assume but little importance; but in this case the insolvency was apparent on the statement of the general account of the bank. There could have been no possible hope of retrieving its affairs, with debts to the amount of one hundred and thirty thousand dollars, with not one dollar in their vaults, and an admitted deficit of twenty-one thousand dollars. It is evident that the continuance of their corporate functions, after May 1820, was not to carry on banking operations; for they had no means whatever to do it. The only possible object was to collect from the wreck what could be saved. The preference therefore given to the United States, could operate in no other manner than as a final extinction of all hope to the private depositors and note holders, by throwing on them alone the loss arising from the deficiency of the funds. This, I think, was wholly unauthorized by the charter, and directly opposed to its spirit and meaning; that it was an abuse of their trust, which a court of law would not enforce, and equity would restrain. Whenever a court of chancery interferes in cases of trusts, they make no discrimination between individuals and a corporation; "a corporation being a trustee, is in this court the same as an individual." 2 Ves. Jun. 46, 47. 14 Ves. 252, 253. If they misapply trust revenues, and by misbehavior are unable to pay moneys due by them, chancery will take the estate out of their hands 7 Brown's P. Cas. *674 235, Coventry Case. So if they mis-spend or misapply trust money, 2 Durn. and East, 200, 204; or as trustees, having the management of a productive fund abuse their trust, 14 Ves. Jun. 252, 253; pledge corporate property for purposes not corporate, 1 Ves. and Beam. 242: deprive by a by-law one member of the company of his share of the profits, 1 Ves. Jun. 316, 322 (where the chancellor examines fully the jurisdiction of the court over corporate trusts): or if the twelve jurymen of a manor court should make a by-law, that the next year's profits should be divided among themselves exclusively, 17 Ves. Jun. 321.
Thus believing that where property is devised or assigned to trustees to pay debts, the law of all courts is perfectly well settled that the trustee has no power to pay one in exclusion of another creditor, where the fund is not sufficient to pay all: finding that by the best established principles of courts of chancery, corporate trusts are within their jurisdiction, and to be exercised by the same rules which control the execution of individual trusts: seeing no authority in the charter for the directors of this bank to make the agreement which is the subject of this suit: and utterly unable to discriminate between the powers and duties of a private or corporate trustee: I must, though standing alone, record my decided dissent from the doctrine settled by the decision of the court in this case.
Though this point has not been made by counsel, nor noticed in the opinion of the court, it necessarily arises on the record: it enters into the very vitals of the cause: its merits cannot be settled without a direct decision upon it: and thinking that the affirmance of the agreement to appropriate the whole effects of the bank exclusively to the United States, establishes, by the high authority of this court, a general principle, applicable to all corporations, all trustees, private or corporate; extending to creditors and stockholders, equally novel and alarming: it is my duty to notice and examine the question with the deliberation and research peculiarly necessary from its intrinsic importance, and the circumstances under which it arose and was considered: it is equally my duty to express the results of my judgment.